UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-62172-CIV-UNGARO
16-60007-CR-ZLOCH

MAURICE EXAIER

v.

UNITED STATES OF AMERICA/

GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITIONER EXAVIER'S
MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE

The United States of America respectfully submits that petitioner Maurice Exavier's Motion To Vacate, Set Aside Or Correct Sentence, DE 1[1], should be denied, since its claims are refuted by the record, internally inconsistent, procedurally barred, and otherwise fail to state sufficient grounds for relief.

INTRODUCTION

A grand jury charged movant and codefendants Jimmy Alexandre and Carline Maurice with conspiracies to commit wire fraud and identity theft, and with substantive wire fraud and identity theft violations.   CRDE 3. These charges addressed a fraudulent tax refund scheme occurring between September, 2010 and July, 2011 that used the personal information of deceased individuals to make false claims for tax refunds. *Id.*

Attorney Mark A. Douglas, Esq. temporarily represented movant.   CRDE 22, 36.   Within two weeks of movant's arraignment, Kevin Kulik, Esq. became movant's permanent counsel and Mr. Douglas was relieved of all further responsibility representing movant.   CRDE 49.

Movant and his codefendants each exercised their right to a jury trial.   The jury convicted movant and codefendant Carline Maurice of all counts charged in the indictment.   CRDE 99, 100. The remaining codefendant, Jimmy Alexandre, was acquitted.

---

1 Docket entry (DE) 1 is under the civil case number; docket entries under the criminal case number appear with the prefix "CRDE".

Movant received a sentence of incarceration for 145 months.   CRDE 134:2. He appealed. His conviction was affirmed.   *United States v. Exavier*, 783 Fed.Appx. 849 (11th Cir. 2019). That opinion summarized the evidence from movant's trial as follows:

> Exavier and Maurice were principals of Broward Financial Services, LLC ("BFS"), Advance Tax and Accounting Services, Inc. ("ATAS"), and Advance Tax and Accounting Services 2 ("ATAS2"). All three companies provided tax preparation services. Alexandre worked as a tax preparer for a separate business called "Mr. Cash and Associates" ("Mr. Cash"). The government alleges that through these businesses, defendants arranged to file false tax returns on behalf of deceased individuals and have refund checks deposited into bank accounts that Exavier and Maurice controlled.
>
> To facilitate electronic filing, the Internal Revenue Service ("IRS") assigns individual tax preparers a Preparer Tax Identification Number ("PTIN"). Similarly, the IRS assigns tax preparation businesses an Electronic Filing Identification Number ("EFIN"). Both the EFIN and PTIN are specific to that business or individual, and cannot be transferred or reassigned. When a tax preparation business files an electronic return, it must include both the EFIN for the business and the PTIN for the individual tax preparer.
>
> In 2003, the IRS issued an EFIN to BFS. In March of 2008, the IRS issued a PTIN to Exavier so that he could file tax returns for BFS clients. In 2009, in addition to tax preparation services, BFS obtained a state license as a money services business to offer check cashing services for tax preparation clients. The EFIN for BFS became inactive in November of 2010, and the IRS suspended its authorization to file tax returns electronically.
>
> In July of 2010, Exavier and Maurice established ATAS, with Maurice as president and Exavier as vice president. The IRS issued an EFIN to ATAS.
>
> On September 10, 2010, a Florida corporation called The Tax Doctors of Broward County reorganized to become ATAS2, with the same business address as ATAS. On September 30, 2010, the IRS issued an EFIN to ATAS2.
>
> In early 2011, ATAS electronically filed 158 income tax returns seeking $536,430 in refunds for deceased individuals. In this same period, ATAS2 electronically filed 312 returns for deceased individuals claiming $1,069,752 in refunds. All of these refunds were filed under EFINs for ATAS and ATAS2 and Maurice's PTIN. Each return included the correct name, birth date, and social security number of the decedent, but listed false information regarding employment, income, contact information, tax credits, deductions, and dependents. The IRS did not actually owe refunds on any of these returns.

2

In transactions involving a paid tax preparer, a taxpayer can direct the IRS to deposit the refund in the bank account of a designated third party. The third party pays the tax preparer directly, then deducts a processing fee and pays the balance to the taxpayer. ATAS and ATAS2 used Santa Barbara Tax Products Group ("SBTPG") to process refunds and pay tax preparation fees. SBTPG sent blank checks to ATAS and ATAS2 and when it received refunds from the IRS, authorized them to print cashier's checks for the taxpayers. The government claimed that defendants used this arrangement so that Maurice and Exavier could deposit refund checks for deceased individuals into accounts which they controlled.

On January 19, 2011, after reviewing nine tax returns that had been filed for deceased individuals under the ATAS EFIN, SBTPG terminated its relationship with ATAS. Other than a few refund checks that issued before it discovered the fraud, SBTPG did not actually issue refunds for the fraudulent returns that ATAS and ATAS2 had filed. SBTPG did deposit tax preparation fees into their bank accounts, however, with ATAS receiving approximately $54,457 and ATAS2 receiving $245,569. Of the $54,457 which ATAS received, $4,000 was traced to Maurice and $2,000 to Exavier, with the balance largely used to pay "1099 commissions" to various unspecified individuals. Of the $245,569 which ATAS2 received, $10,000 was transferred to Maurice through checks, $59,000 was transferred to Exavier through checks, $5,000 was transferred to a BFS bank account, and nine checks totaling $20,350 were made payable to cash. The balance apparently remained in the ATAS2 account or was not directly traceable to defendants.

Alexandre worked as a tax preparer for Mr. Cash in early 2011. He received permission from the company's owner, Yanel Laroche, to file electronic tax returns for his "friends," *i.e.*, tax preparers who had lost their EFINs but who nevertheless wished to service some 1,000 clients. Between January 28 and March 3, 2011, Alexandre filed 363 tax returns electronically under Mr. Cash's EFIN and his own PTIN. Of those 363 tax returns, 345 sought refunds amounting to $1,708,910 in the names of deceased individuals. Like the fraudulent returns which ATAS and ATAS2 filed, Alexandre's returns contained the correct names, birth dates, and social security numbers of the decedents, but listed false information regarding employment, income, contact information, tax credits, deductions, and dependents.

For Alexandre's returns, Mr. Cash used SBTPG to process refunds and pay tax preparation fees. In March of 2011, SBTPG contacted Laroche to alert him that tax returns had been filed for "dead people" under Mr. Cash's EFIN. Laroche discovered that Alexandre had prepared all of those tax returns. When SBTPG detected the fraud, it had already authorized checks for many of the refunds claimed in those returns. Among them, SBTPG had authorized $555,939 in refunds on 161 checks that were printed in the Mr. Cash office and deposited into a BFS business checking account that listed Exavier and Maurice as authorized

signatories. Alexandre, who did not have a physical office at Mr. Cash, was the only individual who had picked up refund checks that SBTPG issued for the fraudulent returns. SBTPG paid $965,585 in refunds that the IRS funded for the 345 fraudulent tax returns that Alexandre prepared in early 2011.

Approximately 97 percent of the checks deposited into the BFS business checking account in the first quarter of 2011 were tax refund checks. At trial, IRS Special Agent Bradley Cohen testified that in addition to the 161 refund checks related to Alexandre's returns, BFS deposits included 491 refund checks totaling $1,785,683 from returns filed by tax preparers other than defendants, ATAS, ATAS2, or Mr. Cash. Of this amount, $639,610 was transferred to another BFS account which listed Maurice and Exavier as signatories. From that account, checks totaling $57,250 were paid to Maurice, $40,500 to Exavier, $19,000 to Exavier's wife, $4,000 to ATAS, and $360,298 to cash. Of the checks made payable to cash, $28,000 was traced to a joint account that belonged to Exavier and his wife. Agent Cohen did not opine on the legitimacy of all of the refund checks from other tax preparers, but he analyzed 100 of the 491 refunds. He found that more than 60 of the refund checks were for deceased individuals and that 18 of them were for incarcerated individuals, two of whom were serving life terms.

Agent Cohen testified that documents from the Office of Financial Regulation had listed BFS as a check cashing and money transmitter business. Agent Cohen testified that in November of 2009, when Exavier applied for a Florida business license, he represented that his check cashing operation was limited to cashing checks for tax clients. Agent Cohen testified that in February of 2012, when he went to visit the principal place of business which BFS listed on its annual report, he did not see any sign which represented that check cashing services were offered there. Agent Cohen testified that from 2010 through 2016, BFS moved several times to and from the most recent address on record with the State of Florida (2033 University Drive, Sunrise, Florida) and where ATAS and ATAS2 were located (930 and 938 N.E. 62 Street, Oakland Park, Florida).

Agent Cohen further testified that some checks on the bank account of Exavier and his wife had been made payable to "Antonio Duval." Other checks drawn on a BFS account were payable to the same individual. Agent Cohen never investigated Duval and did not know how much cash he received from Exavier.

Exavier did not testify at trial. Through counsel, he maintained that he had a legitimate check cashing operation and that perhaps a teller, Duval, or someone else had cooperated with Alexandre in the fraudulent scheme. Exavier's counsel argued that the government's investigation was incomplete because it did not sufficiently investigate the signatures on various documents, the actual sender or recipient of various email communications, or the unidentified recipients of large amounts of money from refund checks and tax preparation fees.

4

Maurice . . . did not testify. Through counsel, she suggested that someone had forged her signature, established bank accounts in her name, and used her PTIN without her knowledge. A handwriting expert testified that "she didn't write the signature on certain of the documents that were submitted" and that as to other documents, his findings were "inconclusive." The expert eliminated Maurice as the signatory on three documents, including two checks, but he could not eliminate her as the person who signed the remaining documents.

At trial, Alexandre testified that he had met a man named "Crazy C," who told him that he and his partners had a tax return preparation business with more than 1,000 clients, but that the business had lost its EFIN. In return for part of the tax preparation fees, Crazy C gave Alexandre information on his clients so that Alexandre could prepare their tax returns for 2010. Alexandre testified that Laroche gave him permission to file the returns through Mr. Cash. Alexandre accepted tax return files from Crazy C and filed the returns electronically under Mr. Cash's EFIN. Alexandre claimed that when he accepted tax returns from Crazy C, he did not know they were for deceased individuals. Alexandre testified that he had no intent to defraud anyone and that he had not conspired with Exavier or Maurice to file fraudulent tax returns. Alexandre testified that he had no idea how tax refund checks ended up in BFS bank accounts because he had simply picked up the checks at Mr. Cash's offices and given them to Crazy C.

783 Fed. Appx. At 852-55.[2]

As the summary above reflects, movant's defense during trial challenged the sufficiency of the government's evidence. Defense attacks included efforts to place blame on Antonio Duval, CRDE 165:117-18, 121-23, and to distance movant from his codefedants. Movant also called a witness who sought preparation of a legitimate tax return from ATAS. CRDE 165:82-83.

Just before movant formally rested his defense case, the Court engaged in a colloquy with movant about his decision not to testify. As part of that colloquy, the Court asked movant, who had been placed under oath, CRDE 166:74, "are you satisfied with Mr. Kulik and the way that he has represented you throughout this entire case?" Movant responded, "Yes, sir." CRDE 166:77-78.

After movant's conviction of all counts charged in the indictment, CRDE 99, the United

---

2 A detailed summary of the evidence is also available from the government's responsive brief on appeal, available at 2018 WL 10471119.

States Probation Office prepared a PreSentence Investigation Report (PSR) which attributed a loss amount exceeding $1.5 million to movant.   For Counts 1-17, the PSR assigned a base offense level of 7, and then increased that level to 23 based on the loss amount.   The PSR then applied further enhancements, including a two-level increase for the number of victims, a two-level increase for sophisticated means, a two-level increase for production or trafficking of an unauthorized access device, and a two level increase for abuse of trust or use of a special skill. The resulting offense level was 31.   Movant received a criminal history score of II.   For Counts 1-17, the PSR therefore applied a guideline range of incarceration for 121-151 months.   Each of the remaining aggravated identity theft counts carried a mandatory sentence of two-years' imprisonment, with the sentence for at least one count running consecutively to the sentence imposed for Counts 1-17.

Counsel for movant objected to the application of every guideline sentencing enhancement which the PSR applied, including the enhancement under U.S.S.G.  2B1.1(b)(11), which concerned the unauthorized production of access devices or authentication features.   CRDE 118. The district court overruled movant's sentencing objections, CRDE 188:6-17, with one exception. Counsel for movant successfully convinced the Court to sustain the objection for abuse of trust. *Id*. at 20-21.   Movant's sentencing guideline range thus decreased to incarceration for 97-121 months, plus 24 months for aggravated identity theft.   CRDE 188:21. The Court sentenced movant to incarceration for 145 months.   CRDE 134.

Before receiving his sentence, movant addressed the Court at length, insisting on his innocence.   Movant stated:

> I would like to apologize to the Court, not because I am guilty of anything that the government have accused me of, but because of my naivete. It is definitely a lesson learned as well a teachable moment.
>
> .  .  .
>
> I want to reassure you that I'm innocent. I was raised better and I know better. I did not steal anyone's identity, nor have I benefited from the proceed of the scam.

I know what it's like to go through it because my own identity had been stolen before and I'm still going through it. I am a United States citizen who believes in paying my taxes in this great country. If I were the individual that the government tried to portray me as, I would not have filed my personal and business taxes for the past 12 years, report my own income, and pay what is due to the IRS since I'm self-employed. I would have just kept it.

The IRS never sent me a penny back and neither have I cheated the government out of anything financially.

I am also a victim and I know for a fact that I was used and taken advantage of. After the IRS have investigated me for five years, talking to a great many people, going through all of my emails, the government has not presented one piece of evidence against me showing that I did anything.

The EIFN for Broward Financial Services which allows the business to e-file tax returns was suspended for unrelated ethical reasons, not to do with identity theft or fraud. I have had my PTIN since 2003 and I have been using it ever since to file tax return. My PTIN was never suspended or revoked up until today. No tax return can be filed to the IRS without a proper PTIN. That is the purpose of requiring every tax preparer to have a PTIN. Without a PTIN, a tax return cannot be e-filed to the IRS. You will receive an error message because it is a required piece of information.

The government mentioned that some tax returns were sent without a PTIN for some reasons and they do not know how it happened. Based on the testimony of the agent at trial showing the importance of PTIN, it is impossible. My PTIN which the government knows very well was never used in any of those tax returns involved in the case, either my name, not even one.

The government included me in the case because checks were cashed at my check cashing store. I had a valid and functional check cashing business with insurance and bond. The City of Oklahoma [sic] where the business was located can verify the legitimacy of the best, so can the landlord for the plaza. The Florida Department of Financial Regulations would have been the first to notice any wrongdoing long before the IRS could have and I would have been charged and fined.

I filed all my required quarterly reports and documents on time to the department. I also filed my business tax returns with the IRS on time for that year. Everything was done accordingly. Nothing was done in secrecy. I had copies of all the checks and IDs for who ever cashed the checks. Shouldn't the government requested documentations and video footage be provided before deciding to charge me criminally, just like they did for Mr. Cash. The same fake IDs that Mr. Cash received from Mr. Alexandre as documentations were also used to cash those checks, if Mr. Cash could not tell if they were fake nor dead, how could my employee be able to tell?

7

The government also mentioned that I benefited from the proceeds because money was transferred to the account ending in 5793 which was not my personal account. That account was the only checking account that I could write checks from in order to get cash for the business.

The account ending in 6187 which was the MSB account which is a money service business account, that was set up by Bank of America headquarters, not by the local branch because they do not have the power to do it. This is why when the bank employee Leonie Pascoe testified at trial referred to MSB as a merchant account when she was asked for the meaning, because she has no clue what is an MSB account. It is a lengthy process. It's complicated, money from the special department from the bank and from FCEN which is the Financial Crime Enforcement Network.

My personal account and the government's diagram is the one ending in 5152, and there was absolutely no money transferred to that account. The government had access to all my accounts, business and personal. Never have they ever saw any tax deposited in any of my other accounts but the MSB account, which is 6187.

The government also testified that 400-plus thousand dollars was unaccounted for from the scam because they could not trace it. Are we to believe that government cannot trace money and checks that were cashed? How were they able to trace the checks that Broward Financial Services cashed?

Your Honor, someone is mysteriously getting away with the crime and the money just like Mr. Alexandre for some reason mysteriously got out of the case. And he's now -- he's the one and only person who can identify this mysterious Crazy C who is no longer unknown. Your Honor, the wrong person was convicted and getting sentenced here today.

I pray to God that the guilty ones be brought to justice one day. . . .

CRDE 188:26-30.

After movant's allocution, his attorney explained to the Court that movant had maintained his innocence throughout the case. CRDE 188:33. Counsel also noted that the defense "had been conducting our own investigation," had learned about the government's case during trial, and anticipated the filing of post-conviction motions. *Id.* Counsel mentioned additionally that the defense had tried to proffer facts supporting movant's innocence to the United States; however, the prosecution had not been persuaded by the proffer. CRDE 188:33, 35.

In his direct appeal, movant claimed that the United States used "false evidence" to convict; improperly presented evidence of other crimes; and failed to present sufficient evidence to support movant's conviction.   Movant further claimed that the trial court incorrectly denied his request for a multiple conspiracy jury instruction and erroneously applied various sentencing enhancements, including the enhancement based on the unauthorized production or trafficking of an access device or authentication feature. Movant's Initial Brief on Appeal, 2018 WL 607563 at *7.   Movant did not prevail on any argument and his conviction and his sentence were affirmed.

Movant now objects that he received ineffective assistance from his counsel.   He claims incorrectly that the United States extended a plea offer prior to trial which counsel supposedly failed to communicate to movant.   He contends that trial counsel did not conduct an adequate defense investigation, because he a) did not trace checks issued as a result of the tax refund fraud; b) did not investigate the identity of the check casher; c) did not investigate the role of an individual named Antonio Duval; and d) did not offer proof of details counsel mentioned in opening statement.   Movant complains that his attorney did not object to the introduction of certain refund checks that were not charged in the indictment, and that counsel declined to cross-examine co-defendant Alexandre. He also protests that counsel did not challenge language in the manner and means section of the indictment, and that counsel did not "properly" object to a sentencing enhancement for unauthorized production or trafficking of an access device or authentication feature.   Finally, movant challenges the sufficiency of evidence for his aggravated identity theft convictions.   As explained below, none of movant's claims have merit.

LEGAL ANALYSIS

## I. <u>Movant Received Effective Assistance</u>

To evaluate movant's allegations of ineffective assistance of counsel, this Court must apply the standards announced in *Strickland v. Washington*, 466 U.S. 668 (1984), which held that "the proper standard of attorney performance is that of reasonably effective assistance," and that the burden is on a criminal defendant to show that "counsel's representation fell below an objective

standard of reasonableness." *Id*. at 667-88.   To determine if a defendant has met this burden:

> a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.   A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.   The court must then determine whether, in light of all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

*Id*. at 690.

The burden of proof for demonstrating ineffective assistance of counsel remains on the petitioner throughout a habeas corpus proceeding.   *Roberts v. Wainwright*, 666 F.2d 517, 519, n.3 (11th Cir.), *cert. denied*, 459 U.S. 878 (1982); *Jones v. Kemp*, 678 F.2d 929, 932 (11th Cir. 1982).

There is a strong presumption that trial counsel provided adequate assistance and made all significant decisions in the exercise of reasonable, professional judgment.   *Strickland*, 466 U.S. at 688-90.   Unless movant can demonstrate prejudice, no relief or evidentiary hearing is called for concerning his claims.   *Harich v. Dugger*, 844 F.2d 1464, 1471, n.7 (11th Cir. 1988)(*en banc*), *cert. denied*, 489 U.S. 1071 (1989).   To establish prejudice, a petitioner must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.   *E.g., Boyd v. Allen*, 592 F.3d 1274, 1293 (11th Cir. 2010).

Movant fails to meet both of the requirements of *Strickland*, sometimes called the performance prong and the prejudice prong.   Failure to show either prong should result in denial of claims of ineffective assistance of counsel, and the court need not even reach both prongs, if either one fails. *See Michael v. Crosby*, 430 F.3d 1310, 1319-1320 (11th Cir. 2005).   In *Michael*, the Court stated:

> Under Strickland [v. Washington, 466 U.S. 668 (1984)], in order to demonstrate that counsel was ineffective, a petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that counsel's deficient performance affected the outcome of the trial. 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. If a defendant

> fails to make a showing as to either performance or prejudice, she is not entitled to relief. Id. at 697, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Thus, we need not address the prejudice prong if we find that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir.2003), cert. denied, 541 U.S. 1034, 124 S.Ct. 2104, 158 L.Ed.2d 718 (2004); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir.2000) ( "Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." (citation omitted)).

In movant's case, both prongs fail.   While noting that a petitioner retains the burden of proving by a preponderance of the evidence that his counsel's performance was unreasonable, the Eleventh Circuit has also emphasized that judicial scrutiny of a lawyer's performance "must be highly deferential." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000)(*en banc*).   There is a strong presumption in favor of competence, making a habeas petitioner's burden of persuasion a heavy one.   *Id*. The presumption of competence remains even where the record is silent or ambiguous.   *Id*. at 1315, n.15.   Even where the petitioner presents some evidence to the contrary, the government never has the burden of showing competence.   *Id*. at 1315.   Where courts examine the performance of experienced trial counsel, the presumption of competence is even stronger.   *Id*. at 1316.

In fact, the degree of incompetence that would warrant relief must be extreme.   A petitioner must show more than the best possible strategy for his case, or even a better strategy than what his lawyer pursued.   Instead, movant must demonstrate that no competent counsel would have done what his attorney did.   *See Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998).   "Even the best criminal defense attorneys would not defend a particular case in the same way."   *Strickland*, 466 U.S. at 689.   Effectiveness has nothing to do with what the best lawyers would have done, or even with what most good lawyers would have done. The inquiry is whether some reasonable lawyer could have acted, under the circumstances, as defense counsel acted. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995)(*en banc*).

Against such standards, movant faces significant obstacles.  His efforts to overcome them fail.  Movant fails to show either deficient performance on the part of counsel or any resulting prejudice.

A.   Movant Has Not Shown Deficient PreTrial Investigation By Counsel

1.   Financial Records

During his trial and direct appeal, movant attacked the sufficiency of the government's case for not fully tracing fraud proceeds and for failing to establish the identity of any specific person who had cashed certain checks.  An IRS agent testified that such undertakings were not always feasible because checks produced during the investigation frequently lacked critical information, such as the bank where the checks were negotiated, or legible cancellation marks. Movant now redirects the arguments made against the United States to his own attorney, arguing in effect that his counsel should have accomplished what federal investigators could not.

A complete failure to investigate may constitute deficient performance in certain circumstances, *see Fugate v. Head*, 261 F.3d 1206, 1217, (11th Cir. 2001); however, this is not such a case.  Trial counsel's uncontradicted statements to the district court reflect that he did engage in investigation of the government's evidence and planned to continue doing so with the benefit of hindsight even after conclusion of movant's trial.   Movant provides this Court with no basis to suspect that his lawyer engaged in no investigation of any of the prosecution's evidence.

Moreover, an attorney has no absolute duty to investigate particular facts or a certain line of defense, so long as the decision not to do so was reasonable under the circumstances. *Chandler*, 218 F.3d at1318 (counsel need not always investigate before declining to pursue a particular defense; choice of defense is a matter of strategy which the petitioner must prove is unreasonable); *Fugate*, 261 F.3d at 1217; *Streeter v. United States*, 335 Fed.Appx. 859, 863-64 (11th Cir. 2009). In this case, movant does not explain what if any investigative steps his attorney could have taken to fully trace fraud proceeds, especially in light of the government's inability to do so.   He offers no example of what his counsel could have done to establish the identity of any individual

12

negotiating a fraudulent check. Movant does not explain how tracing fraud proceeds from accounts he controlled would have established his innocence or resulted in a different outcome at trial. Movant also does not explain how the identity of some speculative person negotiating any check would have changed any guilty verdict; moreover, movant cannot meet his burden of proof by speculating that such a person, if identified, would have provided helpful testimony. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001); *Naranjo v. United States*, No. 06-80316-CR-HURLEY at *11-12, 2013 WL 12213962 (S.D. Fla. Feb. 19, 2013).

Even if someone other than movant negotiated a fraudulent check, such a fact is not inconsistent with movant's guilt. Even if fraud proceeds from an account movant controlled flowed to others in addition to movant, his guilt would not be contradicted. Movant cannot show prejudice from his attorney's alleged failure to investigate these financial details. And even if his attorney did not conduct such an investigation, that course was not unreasonable given its unlikely chance of producing exculpatory evidence or producing any evidence at all when the IRS had been unable to investigate in the manner movant now demands. Movant has not offered sufficient allegations to merit consideration of his claims that counsel acted unreasonably or in a manner that caused him prejudice, and this Court should therefore reject movant's objections concerning investigation of financial records in his case.

2. Investigation of Antonio Duval

During trial, movant's counsel attempted to argue that Antonio Duval should have been investigated by authorities as a suspect for the offenses charged. Counsel succeeded in admitting numerous checks into evidence showing payments to Mr. Duval from accounts movant controlled; however, most of the checks issued to Mr. Duval were dated after the July, 2011 conclusion of the charged fraud. CRDE 165:118-165; 166:7-11; *see also* CRDE 166:35-36 (most of the Duval checks were dated months after fraudulent returns were filed). Movant objects that his attorney did not investigate Mr. Duval.

In his petition, movant maintains that Mr. Duval was the manager of his check cashing

13

store, DE1-1:4, 6, a fact which, if true, was obviously known to movant and which movant was free to communicate to his attorney. Movant speculates that perhaps Duval may have had a connection to Alexandre, movant's acquitted codefendant, and that Duval possibly conspired with Alexandre or Alexandre's associate ("Crazy C") to commit the charged offenses while framing movant.

Movant does no more, however, than speculate. He offers no hint of how his attorney should have investigated Duval or what any investigation would have shown. He provides no reason to believe that Duval was an available witness, let alone one who might have waived his own privilege against self-incrimination and admitted to the commission of felonies in movant's place. Movant wholly fails to meet his burden for gaining any relief, providing only conjecture and hypothesis about an alleged employee. As noted above, mere speculation that a missing witness would have been helpful is insufficient to meet movant's burden of proof. *Johnson*, 256 F.3d 1187; *Naranjo*, 2013 WL 12213962 at *12 ("The movant has not provided an affidavit confirming that Gates would have testified at trial. Therefore, as to the claim that counsel was ineffective for failing to investigate and call Gates as a defense witness, no showing has been made in this collateral proceeding that Gates would have testified as suggested by the movant. Thus, bare and conclusory allegations of ineffective assistance of counsel which contradict the existing record and are unsupported by affidavits or other indicia of reliability, are insufficient to require a hearing or further consideration"); *Marshall v. United States*, Nos. 4:06-CR-26-CDL, 4:11-CV-90103 DCL at *3, 2012 WL 629243 (M.D. Ga. Feb. 27, 2012)("counsel cannot be found to have been ineffective for failing to investigate an avenue of defense that Petitioner speculates could have changed the outcome of the trial").

Movant has not provided details, let alone an affidavit, concerning Duval. Moreover, when movant was ready to rest his defense case, he expressed satisfaction, while under oath, with the way his attorney had handled his entire case. CRDE 166:77-78. His claim regarding Duval should be rejected without further consideration.

### 3.  Counsel's Opening Statement Was Not Ineffective

Movant complains that his attorney performed deficiently because he did not offer proof of certain remarks he made in his opening statement.   His objection concerns counsel's suggestion in opening that movant had several businesses with numerous employees who could have negotiated fraudulent refund checks without movant's knowledge.  According to movant, his attorney abandoned this line of defense in favor of one that focused on Duval.[3]

Yet at the conclusion of movant's case, movant made a sworn representation that he was satisfied with the way his attorney had handled the entire case. Such a sworn statement should be subject to a strong presumption that it is true.  *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977); *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994); *United States v. Niles*, 565 F. App'x 828 (11th Cir. 2014); *United States v. Gonzalez-Mercado*, 808 F.2d 796, 800 n. 8 (11th Cir. 1987)(strong presumption that statements made during plea colloquy are true); *see also Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014). Thus, the record presumptively refutes any claim, including those addressed above, suggesting that movant was anything but a proponent of his attorney's strategy.

Moreover, an opening statement, like anything said by an attorney, is not evidence.   While an opening statement functions as an outline of what an attorney expects proof at trial will establish, *see United States v. Breedlove*, 576 F.2d 57, 60 (5th Cir. 1978), trials are often unpredictable. *See Scott v. McDonough*, 4:06cv533-SPM/AK at *7, 2008 WL 3852688 (N.D. Fla. Aug. 15, 2008)("The fact that the evidence turns out differently than counsel expected is not per se deficient performance"); *Ballard v. Sec'y, Dept. of Corrections*, No. 8:15-cv-1681-T-27JSS at *9, 2018 WL 8898467 (M.D. Fla. Aug. 31, 2018)("the mere fact a defense presentation differs from what was initially stated in opening remarks does not in and of itself constitute ineffective

---

3 Counsel did confront an IRS agent who testified for the United States with a government exhibit that included a BFS employee directory listing eight BFS employees in 2008.  CRDE 163:142. Thus, it is not accurate to say, as movant does, that counsel completely abandoned a defense based on the number of movant's employees.

assistance"). No absolute rule prevents counsel from adjusting any theory of defense to circumstances that develop during trial.

In the instant case, movant could have testified about his businesses and employees, and whether his subordinates also had an opportunity to commit the charged offenses. Knowing, however, what counsel said in opening and what had been presented in his case, movant choose not to testify, which was his right. The exercise of that right, however, does not equate to any deficiency on counsel's part. Significantly, movant's petition fails to identify any other evidence or testimony available to counsel in the absence of testimony from movant himself. Movant once again makes only a speculative claim about what might have been, without showing that whatever evidence he now demands existed or was persuasive. His *post hoc* objection to counsel's opening statement does not merit relief.

B.   Counsel's Approach To Codefendant Alexandre Was Not Ineffective

Movant's raises several complaints concerning his attorney's efforts to address the role of codefendant Alexandre. Alexandre 345 fraudulent returns for dead people. CRDE 163:88, 139. For 161 of these returns, tax refund checks were issued and deposited into a BFS business account that movant controlled. CRDE 163:88; 166:33. Alexandre testified that he was an innocent dupe who believed he was preparing returns for clients of a person he knew only as "Crazy C,"[4] while trusting that client information supposedly furnished by "Crazy C" was accurate. CRDE 170:131-54. During his testimony, Alexandre denied conspiring with movant. CRDE 170:154.

Movant complains that his counsel in opening acknowledged that Alexandre brought certain returns to movant's business,[5] and seems to argue that the remarks during opening were inconsistent with counsel's comment in closing argument that Alexandre appeared to be an impressionable young man. Movant protests that his counsel did not cross-examine Alexandre,

---

4 In his petition, movant claims that outside of the courtroom, Alexandre admitted he was lying when he claimed not to know "Crazy C's" true identity. DE 1-1:5.
5 Counsel made one brief remark during opening that Alexandre submitted "some of his tax returns through Broward Financial Services which is owned by my client, Maurice Exavier." CRDE 159:26.

and objects that his counsel did not investigate Alexandre's defense of trusting "Crazy C." None of these arguments merit relief.

There was no dispute, even from Alexandre himself, that he prepared and caused the filing of returns that proved to be fraudulent.   Movant does not explain how this statement harmed him. Bank records established that refunds for Alexandre's fraudulent returns were deposited into a BFS checking account.   It was not ineffective for counsel to concede some tax preparation connection between Alexandre and BFS.   *See*, *e.g.*, *Schier v. United States*, No. 07-13592 at *2, 2009 WL 405376 (11th Cir. Feb. 19, 2009)(it is only a complete concession of the defendant's guilt which constitutes ineffective assistance of counsel); *Kelly v. United States*, 820 F.2d 1173, 1176 (1987)(reasonable for counsel to concede client's guilt in closing argument for some counts to persuade jury of innocence on other counts); *Scott v. Tucker*, No. 5:12–cv–00278–MP–GRJ at *5, 2015 WL 5047946 (N.D. Fla. Aug. 26, 2015)(concession in opening to establish credibility with jury is not ineffective assistance).

Counsel's description during closing of Alexandre as "impressionable" is not inconsistent with any part of his opening statement.   Movant fails to explain how this passing comment harmed him in any way.   He has provided no indication of either deficient performance or prejudice concerning any remark about Alexandre during opening or closing.   These remarks provide no grounds for relief.

Movant's complaint that counsel did not cross-examine Alexandre is also without merit. Alexandre testified that he did not conspire with movant.   Such a statement could only benefit movant in a case where he was charged with conspiring and acting in concert with Alexandre. Movant does not identify any other portion of Alexandre's testimony that harmed movant or that contradicted any part of movant's own defense.   It was therefore not unreasonable for counsel to leave well enough alone and avoid the risk that further questioning would undo either the benefits or the neutrality of Alexandre's testimony. Whether and how to question a witness is a matter of strategy that courts will treat with great deference; the decision whether to cross-examine a witness

17

is a tactical one well within the discretion of defense counsel.  *Fugate*, 261 F.3d at 1219.

Movant does not explain what cross-examination of Alexandre would have provided.  *See Salter v. McDonough*, 246 Fed.Appx. 623, 626 (11th Cir. 2007)(petitioner who did not explain what he hoped to elicit on cross-examination did not show prejudice). Counsel's tactical decision to decline cross-examination of Alexandre does not provide grounds for relief.

Finally, movant appears to complain that his attorney did not investigate Alexandre's claims about "Crazy C."   Movant speculates without support that "Crazy C" may have conspired with Antonio Duval, but this appears to be pure conjecture.   Moreover, movant does not explain how information about "Crazy C" would exculpate movant, especially when fraudulent returns having nothing to do with Alexandre (and thus "Crazy C") were filed through ATAS and ATAS2, or when fraudulent refund checks having no connection to Alexandre (or "Crazy C") were deposited into movant's BFS account. Since movant cannot establish any personal benefit from an investigation of "Crazy C" based on representations from a codefendant movant describes as a liar, movant cannot show prejudice from the absence of any investigation by counsel, and fails to show he has a meritorious claim.

C.   Admission Of Certain Evidence Was Not The Result Of Ineffective Assistance

Without objection from any defense attorney, CRDE 160:55, the United States was able to admit records from a BFS checking account ending in 6167.[6]   Almost 100% of the deposits into this account consisted of tax refund checks issued to individuals.   Checks that formed the basis for certain counts in the indictment were included in these deposits, and whether identified in the indictment or not, 161 of the deposited refund checks resulted from returns prepared by codefendant Alexandre; however, more than 490 of the deposited refund checks resulted from returns filed through tax preparers not named or charged in the indictment.   An IRS agent testified he lacked knowledge of most of the 490-plus checks.   The agent had examined 100 of the 490

---

6 Records from the account ending in 6167 were contained in Government Exhibit 54, CRDE 96-1, and were admitted with a series of exhibits without objection from any defense attorney.  *Id.*

18

checks not prepared through Alexandre, ATAS, or ATAS2, and learned that more than 60 were also issued to deceased individuals and 18 were issued to inmates, two of whom were serving life sentences.   CRDE 166:27 (testimony responding to an inquiry from the Court).

Movant had claimed that he offered legitimate but unadvertised check-cashing services to BFS tax preparation clients.  *See* CRDE 163:103.   One reason the United States introduced evidence that included all of the deposited refund was to refute movant's explanation for the presence of any refund check deposited in the account.

Movant argues now that his counsel ineffectively failed to object to the admission of the approximately 490 additional checks and to evidence that a number of these checks were issued to the deceased or to inmates.   He does not, however, identify any valid objection his lawyer could have made.   Since no defense attorney objected to admission of these records, including counsel for codefendant Carline Maurice who also had access to the account, movant cannot convincingly argue that no competent attorney would have failed to object to the admission of these records.

One government exhibit consisted of a return by Alexandre for an individual identified as "N.B." that falsely claimed N.B. worked at a school; in fact, for the period addressed in the return, N.B. was serving a life sentence.   Movant's counsel objected to introduction of evidence of the life sentence.   The objection was overruled, and admission of this evidence was later affirmed on appeal.

For the non-Alexandre 490-plus refund checks in the BFS account, counsel for Alexandre rather than the United States elicited testimony, without objection from either co-counsel, that these refunds from other preparers also included refunds for prisoners and the deceased. CRDE 164:37-38. The agent also testified that he was unable to say whether refunds from 18 living persons among the 490 were fraudulent, CRDE 164:88, or whether preparers for the 490 or so returns were associated with movant.   CRDE 164:39-40. The Court also elicited more specific testimony about prisoners and dead payees concerning these refunds.   CRDE 166:27. Movant claims now that admission of the non-Alexandre refunds and related testimony "gave the

prosecution and unfair advantage and tainted the jury."   DE 1-1:19.

Movant does not explain how the evidence he now complains of was unfairly prejudicial or tainting.   Evidence of deposited refunds originating with other preparers was relevant to movant's defense claim that he offered limited check cashing services to his own clients.   Evidence that certain refunds were issued to prisoners was not inherently prejudicial; in fact, the Eleventh Circuit affirmed evidence that one refund went not merely to a prisoner but one who was serving a life sentence.   Information about prisoners and the deceased in non-Alexandre returns came not from the prosecution but from the defense or the Court itself, and the prosecutor did not refer to prisoners or sentences or the 490 additional returns during closing arguments.   Accordingly, and because movant has failed to identify any objection counsel could have made that the trial court would have sustained, he has failed to show either prejudice or deficient performance.

D.   Movant Provides Inadequate Grounds For Relief Based On An Allegedly Uncommunicated Plea Offer

Movant offers incompetent and unpersuasive double-hearsay to support a specious claim that his counsel did not communicate a plea offer that in fact was never made.   According to movant, a prior attorney whose representation ended within two weeks of his permanent appearance told movant's brother that movant had rejected a plea bargain from the United States.[7] Movant objects that he was never informed of this supposed offer.

Movant's strategy before, during, and after his trial was to insist on his innocence.   The United States had no basis to extend any plea offer to a defendant unwilling to admit guilt and apparently unable to meet the most basic requirement for a Rule 11 plea colloquy.   Importantly, in his petition, movant makes no commitment that if offered a plea, he would have declined his right to trial.   Movant instead offers conjecture that if he received the right offer, he might (or arguably, might not) have changed his plea to guilty.   Movant offers no hint of what an acceptable offer may have been, and makes no attempt to show that the prosecution would have agreed to any offer

---

[7] According to movant, prior counsel made the comment at issue after movant was sentenced, DE 1-1:7, long after his brief representation of movant had terminated.

acceptable to movant. Movant has made no attempt to show that the Court would have accepted the terms of any offer, or that these unknown terms would have resulted in a lesser sentence. These omissions are significant, and defeat movant's claim. Even with the hearsay-based affidavits movant has submitted, his claim concerning an uncommunicated offer remains too speculative to warrant relief.

To prevail on a claim of deficient performance based on counsel's failure to communicate a plea bargain, a defendant must show, at a minimum, not only that he would have accepted an offer which counsel failed to communicate, but also that the prosecution would not have withdrawn the offer and the court would have accepted it.   *E.g., Missouri v. Frye*, 566 U.S.134 (2012); *see also Osley v. United States*, 751 F.3d 1214, 1223-24 (11th Cir. 2014)(rejecting defendant's claim that he would have accepted a 15-year plea bargain as "wholly speculative" since it was unclear what terms the prosecution would have offered)(the lack of definition in a plea offer makes it substantially harder to determine it likely that a plea acceptable to the defendant would have been entered without the prosecution canceling it or the trial court refusing to accept it); *Scott v. United States*, 325 Fed.Appx. 822, 825 (11th Cir. 2009)(affirming district court's denial of Section 2255 petition without a hearing where movant did not allege prosecution was amenable to negotiating away statutory sentencing enhancement).   Movant must also show that acceptance of an uncommunicated offer would have resulted in a less severe conviction or sentence. *Osley*, 751 F.2d at 1222, quoting *Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

Movant's petition addresses none of these factors.   Even its description of hearsay from former counsel, who would not have been the attorney negotiating any plea bargain, is not sufficient to establish the existence of an offer, let alone one that would have caused movant to abandon his claim of innocence and secure a sentence lower than the one he received. Accordingly, movant's plea bargain is deficient, and should be denied.

At sentencing, movant's rejection of the jury's verdict and his insistence on his innocence was striking.   Moreover, even in his petition, movant continues to assert his innocence,

inconsistently with any claim that he would have accepted any plea bargain calling for an admission of guilt.   Such protestations of innocence undermine even the inference that movant would have accepted any plea bargain if one had been offered.   *See, e.g., Osley*, 751 F.3d at 1224 (repeated claims of innocence, while not dispositive, are relevant considerations for whether a plea bargain would have been accepted).   Movant's failure to support his claim with competent evidence or to even assert threshold requirements for protesting a supposedly uncommunicated offer warrants denial of any relief.

  E. Movant's Incomprehensible Claim About The Indictment Is Meritless

   Movant claims his counsel ineffectively failed to object that the indictment was "void" because of a single sentence in the manner and means section.   His objection to this language and argument that it would make the entire indictment void are difficult to interpret.   Movant cites no authority supporting his claim that the indictment was void.

   An indictment is sufficient where it tracks the language of the charged criminal statute and states the essential elements of the crime. *United States v. Chalker*, 966 F.3d 1177, 1190 (11th Cir. 2020)( the validity of an indictment is determined by common sense construction and practical rather than technical considerations); *United States v. Critzer*, 951 F.2d 306,307 (11th Cir. 1992)(same).   Movant identifies no failure to track statutory language and no omission of any offense element.   The United States is aware of no such defect in the indictment.

   The indictment against movant included a "manner and means" section with step-by step allegations about the commission of wire fraud and wire fraud conspiracy offenses.   Movant objects to one of seven sentences in this section that states that the defendants "submitted or caused the submission, by means of electronic filing, of tax returns in the names of deceased individuals which contained false and fraudulent claims for refunds in the form of a RAC."[8]   CRDE 3:4.   Movant objects with claims that this sentence lacked "positiveness," was not "direct," did not

---

[8] Elsewhere, the indictment defines a "RAC" as a refund anticipation check, and explains its purpose and function.  CRDE 3:2.

charge an offense, and "left it uncertain."   DE 1-1:7.   These statements are essentially meaningless, and do not state recognized or valid objections.

Even if the language movant now disputes was vague or otherwise deficient, he fails to explain how it would render the entire indictment void.   To the contrary, "[a]llegations in the indictment that are not necessary to establish a violation of a statute are surplusage and may be disregarded if the remaining allegations are sufficient to charge a crime."   *Belfast v. United States*, No 12-20754-CIV-ALTONAGA at *8, 2013 WL 594023 (S.D. Fla. Feb. 14, 2013)(citing *United States v. McIntosh*, 23 F.3d 1454, 1457 (8th Cir. 1994)).   Movant fails to show that the language he disputes made the entire indictment invalid; accordingly, he fails to show that his counsel had a valid objection to raise or that movant was prejudiced.

F.   Movant's Sentencing Claim Is Meritless

Movant claims his attorney did not "properly" object to a guideline sentencing enhancement under U.S.S.G. §2B1.1(b)(11).   The district court applied this enhancement with an explicit reference to subsection 2B1.1(b)(11)(A)(ii), but also found that the section applied based on government arguments which in turn relied on the production or trafficking of unauthorized access devices pursuant to subsection 2B1.1(b)(11)(B)(i).   The Eleventh Circuit affirmed the application of this enhancement.   783 Fed.Appx. at 867-68.   Although movant criticizes his counsel for his focus on Section 2B1.1(b)(11)(A)(ii), movant does not identify what if any valid objection counsel could have successfully raised to application of the specific provision, Section 2B1.1(b)(11)(B)(ii), that the court of appeals affirmed.   Accordingly, he fails to show his attorney performed deficiently.[9]

---

9 Movant also makes a perfunctory claim that his counsel ineffectively handled this issue on appeal.   Appellate counsel is not required to raise all non-frivolous issues on appeal.   *Payne v. United States*, 566 F.3d 1276, 1277 (11th Cir. 2009)(citing *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)).   It is "difficult for a defendant to show his counsel was ineffective for failing to raise certain issues on appeal, particularly if counsel did present other strong issues."   *Id*.   Moreover, "[e]xperienced advocates have emphasized the importance of winnowing out weaker arguments on appeal."   463 U.S. at 751-52.   The district court at sentencing explicitly invoked Section 2B1.1(b)(11)(A) when sentencing movant; thus, counsel was not wrong to challenge this provision

II.   Movant Has Defaulted On An Otherwise Meritless Challenge To His Convictions For
Aggravated Identity Theft

Movant now challenges the merits of his convictions for aggravated identity theft in violation of 18 U.S.C. § 1028A with claims that the United States presented insufficient evidence pursuant to *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), a decision that requires proof the defendant knew the stolen identity belonged to an actual person.

Movant concedes he did not raise this argument before the district court or on appeal.   A defendant who fails to object at the trial court level to error he believes the court has committed or who fails to raise such objection on appeal is procedurally barred from presenting his objection in a motion subsequently filed under Section 2255 absent a showing of cause and prejudice or a fundamental miscarriage of justice.   *See United States v. Frady,* 456 U.S. 152, 166-68 (1982); *Mills v. United States,* 36 F.3d 1052, 1055 (11th Cir.1994).   Movant makes no effort to address the cause and prejudice standard other than to make a perfunctory claim that his attorney did not raise the issue.   DE1:6.   Section 2255 however, is not a substitute for a direct appeal, and casting a merits objection in the guise of an ineffective assistance claim is insufficient to overcome a procedural bar.   *See Hartwig v. United States*, at *6, 2009 WL 179629 (M.D. Fla. Jan 26, 2009). An attorney's ignorance or inadvertence will not satisfy the cause standard, *see Bradford v. Davis*, 923 F.2d 599, 612 (9th Cir. 2019).   While ineffective assistance may show cause, *id*., movant has not made or developed such an allegation to excuse the procedural default of his sufficiency claim.

To show a fundamental miscarriage of justice excusing default, the defendant must show he is factually innocent of the offenses of conviction, as opposed to "mere legal insufficiency."

---

on appeal.   The district court also referred in a general way to its reliance on arguments in government filings, which cited Section 2B1.1(b)(11)(B).   Movant fails to identify any valid appellate argument challenging the use of this provision, and for this reason fails to establish prejudice or ineffective assistance on appeal. *See also Dargon v. United States*, No. 8:10-CV 1192-T-30MAP at *4, 2010 WL 3835826 (M.D. Fla. Sept. 29, 2010)(if the underlying issue has been rejected on direct appeal, it is of no avail to raise it again in the guise of ineffective assistance of counsel).

*McKay v. United States*, 657 F.3d 1190, 1197-98 (11th Cir. 2011). Legal insufficiency, however, is precisely what movant argues, maintaining that the United States did not present legally sufficient proof. Accordingly, this Court should reject movant's claim on the basis of his procedural default.

Even on the merits, however, movant's claim fails. Although the United States was required to show that movant had knowledge that the identities he was charged with stealing belonged to actual persons, this burden is not a heavy one. The United States can rely on circumstantial evidence about an offender's misuse of a victim's identity to prove the offender knew the identity belonged to a real person. *United States v. Gomez-Castro*, 605 F.3d 1245, 1249 (11th Cir. 2010). In *United States v. Benson*, 443 Fed.Appx. 420, 425 (11th Cir. 2011), the Eleventh Circuit found that the district court erred in granting a judgment of acquittal in a prosecution for misusing personal information to claim tax refunds. Although that defendant, like movant, did not personally file the fraudulent return, he possessed the resulting refund check, and the court of appeals reasoned that the defendant would not have engaged in this type of scheme without knowledge that the name and social security number belonged to a real person. *Id*. The Eleventh Circuit held further that the jury could have inferred based on ordinary human experience that the government would verify an individual's name and social security number before accepting a return and issuing a refund check. In this case, as in *Benson*, the United States also presented evidence and testimony that the identification information for the refunds belonged to actual people. *See also United States v. Jones*, 608 Fed.Appx. 748, 757 (11th Cir. 2015)(United States need not present any special proof that particular defendant knew government agency would verify identity, since that knowledge is reasonably inferred from ordinary human experience); *United States v. Jenkins*, 1:11-CR-27(WLS) at *4, 2013 WL 3245206 (M.D. Ga. June 26, 2013)(("a jury could infer that the IRS does not issue 300 treasury checks to fictitious people").

Evidence from movant's trial demonstrated that movant had himself engaged in tax preparation, CRDE 159:131-32; he was a principal and founder of three tax preparation

companies created to execute the scheme to defraud the IRS; he received the majority of the proceeds from the fraudulent scheme; he was the point of contact for Santa Barbara Tax Products Group, the refund transfer company that processed claims and authorized or declined to authorize provision of refund checks; it was movant who assumed the role of compliance officer for anti-money laundering safeguards and review of the BFS employee handbook for check-cashing procedures; it was movant who had signature authority over the BFS account receiving fraudulent refund checks, and it was movant who determined that Carline Maurice would also have authority over the account as the fraud continued; it was movant who interacted with Florida regulators, local law enforcement, and the IRS during their efforts to monitor BFS or investigate fraud complaints; and it was movant who had a managing role over BFS, ATAS, and ATAS2.

Evidence also included an electronic mail message sent from Santa Barbara Tax Products Group to movant with a link used to show that refunds were being claimed for the deceased. CRDE 160:153. In this context, a jury could reasonably infer that movant had knowledge of IRS or even financial institution verification procedures for identity, and the successful receipt and deposit of refunds was sufficient to show knowledge that identification for actual persons had been used to commit fraud. Movant also received a link to verify the status of individuals for whom refunds were being claimed and issued. This evidence was sufficient to meet the requirements of *Flores-Figueroa*.

CONCLUSION

For all of the foregoing reasons, this Court should deny movant's petition to vacate, set aside or correct his sentence. The record refutes the majority of movant's factual assertions. Movant also fails to allege a sufficient basis for relief and does not present claims that indicate how he would have been prejudiced by counsel's performance. His sufficiency claim for aggravated identity theft counts is procedurally barred and otherwise meritless. His claims do not warrant a hearing or any other relief.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:   s/ Karen E. Rochlin
KAREN E. ROCHLIN
ASSISTANT U.S. ATTORNEY
99 N.E. 4th Street
Miami, Florida   33132
(305) 961-9234
Court I.D. No. A5500050
karen.rochlin@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF and by

mail on Maurice Exavier, 12300-104, FCI Miami, P.O. Box 779800, Miami, Florida   33177.


s/ Karen E. Rochlin